## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

IN THE MATTER OF THE
APPLICATION OF THE UNITED
STATES FOR AUTHORIZATION
TO CONDUCT A SEARCH OF:
AN APPLE IPHONE (CELLULAR
TELEPHONE), MODEL: PRO, COLOR:
MIDNIGHT- SPACE GRAY, LABELED
FBI EVIDENCE NUMBER E6605949.

Case No. 23-mj-8045-TJJ

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application, under Federal Rule of Criminal Procedure 41, for a search warrant authorizing the examination and data extraction described in Attachment A, namely, an Apple iPhone, Model: Pro; Color: Midnight-Space Gray, Labeled FBI Evidence Number: E6605949 (hereinafter, the "Target Telephone"), belonging to Darien Chambers (CHAMBERS), and the seizure from that property of evidence, fruits, and/or instrumentalities of the crimes described in the affidavit and Attachment B.  Based on the facts set forth in this affidavit, I believe the Target Telephone was used in furtherance of violations of Title 18, United States Code, Sections 1951(a) and 2 (Interference with Commerce by Robbery) and Title 18, United States Code, Section 924(c)(1)(A)(ii) and 2 (Use of a Firearm in Furtherance of a Crime of Violence).  I submit there is probable cause to believe a search of the Target Telephone will lead to evidence, fruits, and instrumentalities of the aforementioned crimes.  At the time of this search warrant application, the Target Telephone (belonging to CHAMBERS) is stored at the Federal Bureau of Investigation (FBI) Topeka Resident Agency (TRA), 515 South Kansas Avenue, Topeka, Kansas.

1

2.    I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

3.    I am a Federal Bureau of Investigation (FBI) Task Force Officer (TFO) currently assigned to the Safe Streets Task Force (SSTF) of the Topeka, Kansas Resident Agency. I have been a Law Enforcement Officer in the State of Kansas since 2012. As a TFO with the FBI, and assigned to the SSTF, my official duties include, but are not limited to, investigations of violations of various Federal and State criminal laws. I have participated in numerous investigations relating to conspiracy to commit Hobbs Act Robbery and Hobbs Act Robbery, along with investigations surrounding person(s) prohibited from possessing firearms, and person(s) in possession and/or in use of a firearm(s) in furtherance of a crime of violence all relating to violations under Title 18, of the United States Code.

## CURRENT INVESTIGATION

4.    Based on the evidence gathered during the investigation, I believe there is probable cause that Darien Chambers (CHAMBERS) has committed the offenses described above and that a search of the Target Telephone described in Attachment A will lead to evidence, fruits and/or instrumentalities of violations of Title 18, United States Code, Sections 1951(a) and 2 (Interference with Commerce by Robbery) and Title 18, United States Code, Section 924(c)(1)(A)(ii) and 2 (Use of a Firearm in Furtherance of a Crime of Violence).

5.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers and agents. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

2

## PROBABLE CAUSE

6.     On April 2, 2022, Lawrence, Kansas Police Department (LKPD) personnel responded to T-Mobile, 4801 Bauer Farm Drive, Lawrence, Kansas, in reference to an aggravated robbery and kidnapping which had just occurred. Prior to law enforcement's arrival, witnesses in the area notified Douglas County Dispatch that they had observed two subjects exit the T-Mobile store carrying multiple trash bags of what appeared to contain cell phones.

7.     LKPD Officer Sullivan (Sullivan) was the first officer to arrive on scene. He did not observe anyone in the T-Mobile store and the lights were off inside the business. Officer Sullivan found the front doors to the business unlocked and entered the store. Officer Sullivan observed the cash register drawers open with no money inside. Officer Sullivan announced his presence in the store and heard muffled yelling coming from a room in the back of the business.

8.     Officer Sullivan walked to the back room and a subject inside the room opened the door for the officer, as the door was locked from the outside. Once the door opened, Officer Sullivan observed two male T-Mobile employees, E.G. and C.A., restrained with duct tape. Officer Sullivan noted both victims had duct tape around their arms, wrists, legs, heads, and mouths. After Officer Sullivan freed E.G. and C.A., they said the store had just been robbed by two individuals.

9.     LKPD Detective Kim Nicholson responded to the T-Mobile store and interviewed E.G. E.G. said that at approximately 7:45 p.m. (on April 2, 2022), he and C.A. were inside the business, waiting to close at 8:00 p.m. E.G. then observed a white passenger car pull in front of the store. Soon after, a subject (wearing a black sweatshirt, black pants, black shoes, black sunglasses, a black face mask, and blue surgical gloves) exited the vehicle's driver's seat and walked toward the front doors. When this individual entered the store, the subject pulled out a black firearm and demanded E.G. and C.A. walk to the back of the store.

3

10.    E.G. said he and C.A. complied with the subject's demands and went to the back room of the business. E.G. advised a second subject, wearing the exact same clothing, entered the business after the first suspect. Based on the voices and body builds, E.G. believed the first individual who entered and brandished a firearm was a male and the second suspect who entered was a female.

11.    After entering the back room, the male robber directed E.G. to enter the safe's code and to provide the male with keys to the cash drawers and front door. E.G. complied with both requests. The male robber then left the back room and told his female accomplice to "pop whichever one moves first." E.G. noticed the female, standing at the backroom's doorway, was also holding a black firearm. When the male robber returned to the back room (after locking the business' front doors and turning off lights), he asked E.G. which phone in the safe had the tracker in it. E.G. told the male he did not know. The male robber then duct-taped E.G.'s arms to the sides of his body and his feet together. The male robber then duct-taped C.A. in the same manner.

12.    E.G. said the male robber turned his attention to the safe, appearing to locate the "tracker phone." After several minutes, the male robber asked E.G. for the code to the right side of the safe, as it was on a 10-minute release lock. E.G. then told the male robber the safe's code. The male robber then methodically removed all cellular telephones and other electronic devices from the safe and placed them in multiple white trash bags. Soon after, the male robber taped the two employees' mouths shut and taped them to their respective chairs. Before leaving the back room, the male robber said, "I'm sure someone will come get you." E.G. said he and C.A. remained still for approximately five minutes to confirm the suspects were gone. E.G. said he then heard an officer in the store and hopped over to the door to open it.

4

13.    LKPD Major Hayden Fowler interviewed C.A. about the robbery. C.A. provided a similar version of the account. C.A. said when the white vehicle first pulled up in front of the store, he believed it was a Subaru, as he had recently test-driven a similar model and recognized the emblem on the vehicle's front grill.

14.    LKPD Detective Charles Cottengim spoke with witness Isabella McDonnell, who witnessed the suspects leaving. McDonnell said she was in the Orange Leaf parking lot, located just east of the T-Mobile store, and observed two subjects (dressed in all black) exit T-Mobile carrying large white trash bags full of items. McDonnell said one of the suspects appeared to be heavier set and the vehicle's driver appeared to be African American. McDonnell said after the two loaded the white trash bags into their white passenger car, they drove off. As the vehicle passed by her, she could see the front license plate was covered with something (possibly gray tape or paper).

15.    On April 2, 2022, Detective Nicholson contacted Justin McBride with Wireless Vision, the Asset Protection Auditor for T-Mobile. McBride said he had access to the surveillance cameras inside the store. McBride submitted interior video surveillance from approximately 5:00 p.m. to 8:10 p.m. (on April 2, 2022). Detective Nicholson requested this timeframe to ascertain if the suspects cased the store prior to the robbery.

16.    Detective Nicholson began reviewing the video surveillance before the robbery. At approximately 7:45 p.m. (on April 2, 2022), Detective Nicholson observed a white passenger vehicle pull toward the front of the T-Mobile store and then back up into a parking spot in the lot. Detective Nicholson observed the vehicle's windows came back to almost a point above the rear tires, and it had a black air dam on the lower portion of the front bumper.

5



17.    Approximately 30 seconds later, Detective Nicholson observed the same white vehicle pulled into the furthest west parking spot, directly in front of T-Mobile. When the vehicle pulled in, Detective Nicholson noticed it had the front running lights on, which appeared to be LED lights. Detective Nicholson observed the vehicle's front bumper had chrome across the grill, with a small emblem in the middle of the grill. Below the grill and emblem, Detective Nicholson observed a front license plate with a black outline around it. On the front bumper's lower portion, Detective Nicholson observed it had a black front air dam. On each side of the air dam, Detective Nicholson noticed white coloration which curved upwards into the front bumper.



18.    After the vehicle pulled in, the driver's side door opened and what appeared to be a male subject (wearing all black clothing with blue surgical gloves on) walked into the T-Mobile store and pulled out a handgun from his waist area. From the video, Detective Nicholson observed the vehicle's front passenger door opening, and a heavier-set subject (believed to be the female, also wearing black clothing and blue surgical gloves) exited. Detective Nicholson

observed a large white object (believed to be a roll of white trash bags) in the female subject's right pants pocket. The video reflected that when the male suspect escorted the T-Mobile employees to the back room, the female suspect stayed at the front doors and attempted to lock them from the inside. The female suspect did not appear to lock the doors and then walked to the back room.

19. From the interior video surveillance, Detective Nicholson observed a similar sequence of events as what the victims described. After the male robber finished duct-taping E.G., the male robber removed phones from the safe and placed them in multiple trash bags. As the male robber removed items from the safe, the female robber walked to the front of the store and placed accessory items into white trash bags.

20. Once the male robber finished removing the items from the safe, he duct-taped E.G.'s mouth, placed additional tape around C.A.'s mouth, and taped them both to their respective chairs. When the robbers left the store, Detective Nicholson observed the male robber place multiple white trash bags in the white vehicle's rear passenger seat. The white suspect vehicle then drove out of the camera's view at approximately 8:09 – 8:10 p.m. (on April 2, 2022).

21. Based on Detective Nicholson's familiarity of the area, she knew the suspect vehicle was most likely to exit the parking lot by turning south on Bauer Lane and then westbound on W. 6th Street (Lawrence, Kansas). Detective Nicholson reviewed the traffic camera at W. 6th Street and Wakarusa Drive. At approximately 8:10:07 p.m., she observed a white passenger car traveling westbound on W. 6th Street and then turning southbound onto Wakarusa Drive. As the vehicle turned, Detective Nicholson observed the vehicle had LED headlights, a black air dam, and the windows appeared to be similarly shaped as the suspect vehicle. Detective Nicholson could also see a large white item in the vehicle's rear passenger seat.

7



22.     To further identify the suspect vehicle, Detective Nicholson utilized City of Lawrence traffic cameras, Automated License Plate Reader's (ALPRs), and obtained surveillance video from various business entities near the T-Mobile store. Through Detective Nicholson's review of traffic cameras, ALPRs, and surveillance video, she located the white Subaru Legacy associated to the T-Mobile robbery.

23.     From approximately 5:37 p.m. to 7:38 p.m. (on April 2, 2022), Detective Nicholson tracked the white Subaru Legacy traveling in the area of the T-Mobile store (4801 Bauer Farm Drive, Lawrence, Kansas). During this timeframe, Detective Nicholson observed the Subaru Legacy parked in various business parking lots near the T-Mobile store. At one point, Detective Nicholson observed the Subaru Legacy pull into the "Theater Lawrence" parking lot (4660 Bauer Farm Drive) and a dark figure exited the driver's door. The dark figure walked to the back of the vehicle for a few moments, then toward the front, and bent down in the area of the front license plate. Detective Nicholson believed the subject was covering the license plates. At approximately 7:45 p.m. (on April 2, 2022), Detective Nicholson observed the Subaru Legacy pull up to park in front of the T-Mobile store (just prior to the robbery). Based on your Affiant's training and experience, it is common for robbery suspect(s) to "case" the area by conducting surveillance to further strategize methods before carrying out the robbery.

24.     After collecting the surveillance video footage, Detective Nicholson entered the footage into Briefcam, a web-based video analytical program which allows for rapid review and search of video. Through Briefcam, Detective Nicholson sorted through all the white passenger

cars in the area between 5:00 p.m. to 7:00 p.m. (on April 2, 2022). Briefcam identified approximately 808 vehicles that were consistent to the vehicle description used to commit the robbery of the T-Mobile store on April 2, 2022. After reviewing the 808 vehicles, Detective Nicholson located only one vehicle which had the same matching descriptors as the suspect vehicle.



25.     Detective Nicholson continued to track the vehicle before and after the robbery within the city limits of Lawrence, Kansas. Detective Nicholson noted the ALPR at the intersection of Clinton Parkway and Wakarusa Drive captured and identified the vehicle as bearing Illinois license plate Q281403. Detective Nicholson checked the license plate through state files, which revealed it was registered to a white 2020 Subaru Legacy and the listed owner as Dollar Tree LSE, 3000 Lakeside Drive FL2, Bannockburn, Illinois.

26.     After identifying the suspect vehicle, Detective Nicholson checked local records for any contacts with the Subaru Legacy. Detective Nicholson located one car stop on the vehicle which occurred on August 30, 2021, in which LKPD Officer Skyler Richardson (Richardson) stopped the Legacy for driving without headlights. Officer Richardson issued a warning ticket to the Legacy's driver, listed as Darien K. Chambers, date of birth (DOB) May 7, 1993. Kansas state records showed CHAMBERS was a black male, approximately 5'05"/170lbs, with a listed address of 3601 Clinton Parkway, Apt. E205, Lawrence, Kansas.

27.     Detective Nicholson then searched CHAMBERS through multiple web-based programs, which revealed CHAMBERS had a prior address in Nashville, Tennessee and an address of 309 Fieldstone Court, Bolingbrook, Illinois. Along with the address information, Detective Nicholson located a mobile phone number [(630) 806-9343] associated with CHAMBERS. Detective Nicholson also reviewed CHAMBERS' previous work history, which revealed he had worked at Wireless Lifestyle (a Sprint retailer) and Cellco Partnership (dba Verizon). Detective Nicholson learned CHAMBERS had been listed as an employee of Dollar Tree Stores as recently as December 2021.

28.     Detective Nicholson then researched phone number (630) 806-9343, which showed Sprint (now T-Mobile) as the service provider and Darien Chambers as the listed subscriber.

29.     On April 13, 2022, Detective Nicholson applied for, and was granted, a search warrant for call detail records (CDRs) associated with phone number (630) 806-9343 from March 28 - April 9, 2022, by a Douglas County, Kansas District Court Judge. On Friday, April 15, 2022, Detective Nicholson received the CDRs from T-Mobile, which revealed the phone was associated with an Apple iPhone 13 Pro Max.

30.     Detective Nicholson analyzed the CDRs for phone number (630) 806-9343 and found the phone communicated with cell towers in Lawrence, Kansas on April 1, 2022. On April 2, 2022, she found the phone number did not communicate with any towers and no location information was available, leading her to believe the phone was either turned off or the location services were turned off. Detective Nicholson noted the phone started communicating with cell towers again on April 3, 2022, in the area of 309 Fieldstone Court, Bolingbrook, Illinois, which was later identified as CHAMBERS' mother's (Sonya Chambers') residence.

10

31.    Detective Nicholson researched the phone numbers CHAMBERS had called during the time period and observed most of the subscriber numbers had an association with Dollar Tree. However, Detective Nicholson noted one specific telephone number, identified as (773) 372-9755, had consistent and frequent contact with CHAMBERS' (630) 806-9343 number before and after the date of the robbery. Detective Nicholson noticed that between April 1, 2022, through April 3, 2022, there was less contact between CHAMBERS' phone and telephone number (773) 372-9755. Telephone number (773) 372-9755 was later revealed to be associated with an Iveth Moreno (MORENO).

32.    On October 9, 2022, Detective Nicholson applied for and was granted search warrants for: 1) the premises located at 3601 Clinton Parkway, Apartment E205, Lawrence, Kansas; and 2) the white Subaru Legacy, bearing Illinois license plate Q281403. Detective Nicholson applied for the two search warrants after obtaining the following:

- Leading up to the application of the search warrant at 3601 Clinton Parkway, Apartment E205, Lawrence, Kansas, video surveillance reviewed by Detective Nicholson captured CHAMBERS outside of the residence.

- Detective Nicholson observed the white Subaru Legacy, bearing Illinois license plate Q281403, parked outside the apartment.

- CHAMBERS' Kansas driver's license lists the address of 3601 Clinton Parkway, Apartment E205, Lawrence, Kansas.

- Investigators had prior knowledge of LPD Officer Richardson's August 30, 2021 traffic stop, in which CHAMBERS provided 3601 Clinton Parkway Drive, Apartment E205, Lawrence, Kansas as his address. Officer Richardson's report reflected CHAMBERS drove the 2020 Subaru Legacy, bearing Illinois license plate Q281403, at the time of the traffic stop.

33.    On October 10, 2022, your Affiant, Detective Nicholson, and members of the Lawrence, Kansas Police Department (LKPD) and Federal Bureau of Investigation (FBI) executed the two search warrants at 3601 Clinton Parkway, Apartment E205, Lawrence, Kansas,

11

along with the white Subaru, bearing Illinois license plate Q281403, parked outside the apartment. During the execution of the search warrants, your Affiant and Detective Nicholson contacted CHAMBERS at the doorway of 3601 Clinton Parkway, Apartment E205, Lawrence, Kansas. CHAMBERS was taken into custody without incident for aggravated robbery and kidnapping. Upon search incident to arrest, Detective Nicholson located an Apple iPhone in CHAMBERS' pants pocket, which had a clear case on it and a picture of his two dogs on the lock screen. During a subsequent interview of CHAMBERS, he claimed the phone in his pocket was his Dollar Tree work phone and the phone number assigned was (312) 841-4872. CHAMBERS claimed his personal cell phone, with cell number (630) 806-9343, was currently dead and inside the apartment. Investigators collected both cell phones during the search warrant and arrest of CHAMBERS.

34.    Subsequently, CHAMBERS was transported to LKPD Headquarters, located at 5100 Overland Drive, Lawrence, Kansas for a custodial interview.

35.    During the search warrant execution of the white Subaru Legacy, law enforcement personnel located a black Glock 17 9mm caliber firearm (bearing serial number BWFU447) under the driver's seat. The Glock 17 9mm firearm had a magazine inserted containing fifteen (15) live cartridges. No live cartridge was chambered in the firearm. In the Subaru's center console, law enforcement located six (6) blue surgical gloves. Within a black backpack in the Subaru's trunk, law enforcement personnel located $9,320.00 in United States Currency. Law enforcement also located a pair of all black Interceptor Men's boots (Size 8).

36.    Detective Nicholson and your Affiant conducted the custodial interview with CHAMBERS. CHAMBERS was advised of his *Miranda* Rights and agreed to speak with law enforcement. Investigators asked him whether he was in Lawrence, Kansas on April 1, 2022, and April 2, 2022. CHAMBERS confirmed he was in town that weekend and in

12

possession/driving the white Subaru bearing Illinois license plate Q281403. CHAMBERS advised he had no knowledge or involvement in the robbery of T-Mobile. Investigators previously learned CHAMBERS had rented a hotel room at the Country Inn and Suites, 2176 E. 23rd Street, Lawrence, Kansas. Country Inn and Suites records showed CHAMBERS checked into the hotel on April 1, 2022, and checked out on April 2, 2022. CHAMBERS was asked about the hotel reservation and he recalled meeting up with a friend and two females at the hotel. CHAMBERS reported one of the unidentified females stayed at the hotel with him overnight on April 1, 2022, through April 2, 2022. Officers asked CHAMBERS whether his vehicle was in the area of the T-Mobile store on April 2, 2022, but CHAMBERS could not recall. CHAMBERS later said that while he was in Lawrence, he had attended a going away party for "a friend of a friend" near the area of W. 23rd and Louisiana Street. CHAMBERS said he attended the party on April 2, 2022, from approximately 5:00 p.m. to 8:00 p.m. According to Apple Maps (a cellular navigation application), the T-Mobile store (robbery location) is approximately 5.5 miles away from the area of W. 23rd Street and Louisiana Street.

37.    On October 12, 2022, Detective Nicholson applied for a search warrant for the two Apple iPhones seized from CHAMBERS' arrest on October 10, 2022. LKPD Detective James Welsh and LKPD Civilian Investigator Nathan Heinen were each assigned an Apple iPhone to process and examine separately. Upon Detective Welsh's review of the search warrant to the iPhone he was assigned to examine, Detective Welsh noted the search warrant described the cellular telephone as an Apple iPhone 14. Upon further review, it was unclear if the phone was an Apple iPhone 14, so Detective Nicholson completed an amended search warrant to provide a more general description of the cellular device. On November 2, 2022, the amended search warrant was granted by a Douglas County, Kansas District Court Judge. Detective

13

Nicholson reviewed the cellular telephone data in accordance with the authorized dates listed on the search warrants (March 30, 2022 through October 10, 2022).

38.    In the "message" portions, obtained from the two Apple iPhone IOS extraction reports, Detective Nicholson noted a string of text messages that appeared similar on both cellular devices.  Detective Nicholson located a string of text messages between CHAMBERS' Apple iPhone (IMEI: 355380259352390) and Iveth MORENO's phone number (773) 372-9755. On March 30, 2022, at approximately 6:34 p.m., the cellular telephone associated with MORENO sent CHAMBERS a "selfie" (photograph) of a white female, with dark hair, dressed in all black baggy clothing.  Along with the photograph, a message was also sent stating, "*I'm ready g LMAOOO, Got some baggy ass shit LMAO, Put my hoodie up and ima look like a str8 guy LMAO.*"



Detective Nicholson noted the clothing worn by the female in the photograph (above) is consistent to the clothing worn by the female suspect during the robbery of the T-Mobile.

39.    Detective Nicholson continued to review the messages between MORENO and CHAMBERS and noted on April 1, 2022, the only communication between the numbers appeared to be mobile telephone video games sent back and forth.  At approximately 10:45 p.m.,

14

(on April 1, 2022), MORENO texted CHAMBERS, "I'll brb ima go downstairs lmao." Based on the lack of actual text messages sent between the telephone numbers, this led investigators to believe MORENO and CHAMBERS were possibly together. CHAMBERS previously reported he stayed with an unidentified female on April 1, 2022, through April 2, 2022, at the Country Inn and Suites, 2176 E. 23rd Street, Lawrence, Kansas.

40.     The next pertinent text message string between MORENO and CHAMBERS occurred on April 3, 2022, at 7:49 a.m. MORENO texted: "Okok be safe. Thanks for the trip!!! I'll text u later I'm gonna sleep lol Gn." CHAMBERS responded: "Lmao thanks for comin...I'll holla at you later."

41.     Detective Nicholson located a text message, sent from MORENO to CHAMBERS on April 4, 2022, at approximately 12:29 AM, with the following note pad attachment.

"Lick #1 with gang 😊
iPhone 13pro max-
3-256gbs $ 1000
12-128gbs $ 900 (850)
iPhone 13pros -
1-256gbs $ 900
3- 128gbs $ 850
iPhone 13s -
4- 256gbs $ 700
20- 128gbs $ 650
JBL Clip 4 x2 ($50 each) (1 left)
JBL Tune600BT x2 ($70 each)
JBL tune125 x1 ($80)
Airpods x5 ($100 each)
Airpods 3rd gen x2 ($120)
Galaxy Buds x2 ($120 each)
Galaxy buds pro x2 ($150 each)
Buds live x2 ($140 each)
Beats fit pro x1 ($130 each)

15

Powerbeats pro x1 ($160 each)
Beats studio buds x1 ($100)
Beats flex x2 ($30 each)
Apple EarPods x2 ($15 each)
Alcatel joy tab2 x2 ($50 each)
MagSafe charger x1 ($30 each)
USB-C Adapter 20W x20 ($10 each)
Wireless charging car mount ($40 )
Wireless charging pad ($40)
LG TONE style headset ($80)
Universal portable charger x2($20each)
Super fast charger x3 ($15 each)
USB-C cable w usb c connecter x2 ($10 each)
USB-A cable w micro usb connecter x5 ($10 each)
Otter Car charger x2 ($20 each)
•••iPhone cases???? Idk how much but there's 10 •••
(STILL WORKING ON EVERYTHING ELSE, CHANGE ANYTHING IF U NEED
TOO BEFORE I POST IT TOMORROW NIGHT ON OFFER UP GANG AND LMK
IF U WANNA KEEP ANYTHING SO I CAN TAKE IT OFF) xoxo 😘 "

42.     Based on training and experience, your Affiant knows the term "Lick" is commonly used when referring to a robbery.  Detective Nicholson received an itemized list of the stolen items from the April 2, 2022 T-Mobile robbery.  The list included approximately 87 items, including Apple Watches, Apple iPhone 13 Pro Max's, Apple iPhone 13's, Samsung Galaxy Watches, Apple AirPods (headphones), Powerbeats and Beats Studio (headphones), JBL Tune's (Bluetooth Speakers), Samsung Galaxy Buds (headphones), Alcatel Joy Tab's (Tablets), along with various other brands and models of electronic devices and electronic device chargers. According to T-Mobile, the estimated total loss was approximately $48,895.00.

43.     Detective Nicholson compared listed items, exchanged between MORENO and CHAMBERS, to the list of the stolen items provided by T-Mobile.  Detective Nicholson noted many of the makes, models, and quantities of electronic items from the list above (labeled, "Lick #1 with gang") matched the stolen item list provided by T-Mobile.  In later messages between

16

MORENO and CHAMBERS, Detective Nicholson located numerous conversations referencing MORENO selling the iPhones and asking CHAMBERS how much to charge for them.

44.     On May 4, 2022, MORENO sent CHAMBERS a screen shot of a Lawrence Journal World article about the T-Mobile robbery.



45.     Based on the information obtained from CHAMBERS' cellular telephones, and the communications and images exchanged with MORENO, investigators believed MORENO was the second suspect with CHAMBERS during the April 2, 2022 T-Mobile robbery.

46.     On December 20, 2022, Detective Nicholson applied for, and was granted, a search warrant by a Douglas County, Kansas District Court Judge for the call detail records (CDRs) of telephone number (773) 372-9755 (from March 28, 2022, to April 9, 2022).  On December 29, 2022, Detective Nicholson received the records from AT&T, which revealed Iveth

MORENO as the listed subscriber of (773) 372-9755. Within the subscriber information, MORENO had a listed address of 3424 W. 71st Street, Chicago, Illinois, 60629.

47.    Detective Nicholson reviewed the CDRs associated to MORENO's (773) 372-9755 number and learned that on March 31, 2022, at approximately 11:24 p.m., the cellular telephone began to travel from Illinois to Lawrence, Kansas. When comparing the CDRs of MORENO's cellular telephone and the CDRs associated to CHAMBERS' cellular telephone, the two cell phones appear to communicate off the same cellular towers, at approximately the same time(s), indicating MORENO's and CHAMBERS' cellular telephones were traveling together. Upon further review, at approximately 05:37:55 p.m. (on April 2, 2022), MORENO's cellular telephone communicated with a cellular tower in the area of W. 6th Street and Wakarusa Drive, Lawrence, Kansas (near the T-Mobile store). This is also the approximate time the white Subaru Legacy (bearing Illinois registration: Q281403) arrives in the area of the T-Mobile store. Additionally, the CDRs associated to MORENO's cellular telephone show that at approximately 07:45:50 p.m. (on April 2, 2022), MORENO's cellular telephone communicated with a tower just north of the T-Mobile store and places the cellular telephone in the T-Mobile store at the time of the armed robbery.

48.    On or about April 2, 2022, LKPD Crime Scene Investigators processed the T-Mobile robbery scene. Officers collected the duct tape used to bound the two employees and submitted the evidence to the Kansas Bureau of Investigations (KBI) Laboratory. A result of the testing/examination revealed that three latent prints and two palm prints matched the known fingerprints and palm prints of CHAMBERS.

49.    On February 9, 2023, a Kansas City, Kansas Grand Jury returned a true bill, charging both CHAMBERS and MORENO with a two-count Indictment (Count 1: Title 18 U.S.C. 1951 (a) and 2 – Interference with Commerce by Robbery; and Count 2: Title 18 U.S.C.

18

924(c)(1)(A)(ii) and 2 – Use of a Firearm in Furtherance of a Crime of Violence). The District of Kansas case number is 23-20009-01/02-DDC.

50.    On February 9, 2023, a federal arrest warrant was issued for MORENO and CHAMBERS. Your Affiant and FBI TFO Patrick Salmon (Salmon) traveled to Chicago, Illinois to locate and apprehend MORENO and CHAMBERS. On February 9, 2023, FBI Special Agents and Task Force Officers contacted CHAMBERS' mother, Sonya Chambers, at 309 Fieldstone Court, Bolingbrook, Illinois. Sonya then telephonically contacted her son, Darien CHAMBERS, and requested he respond to the residence to meet with law enforcement.

51.    Pursuant to the federal arrest warrant, CHAMBERS was apprehended without incident. CHAMBERS was transported to the Orland Park, Illinois Police Department. Your Affiant and FBI Task Force Officer Salmon attempted an interview with CHAMBERS. CHAMBERS was advised of his "Advice of Rights" (*Miranda* Warning) and CHAMBERS requested an attorney.

52.    At the time of CHAMBERS' arrest, law enforcement seized an **Apple iPhone, Model: Pro, Color: Midnight-Space Gray (Target Telephone)** from CHAMBERS' person.

53.    On February 9, 2023, FBI Special Agents (SA's) and FBI Task Force Officers (TFO's) contacted Iveth MORENO's parents (Laura and David Moreno). David reported CHAMBERS had stopped by their residence, 3433 W. 71st Street, Chicago, Illinois, approximately one week prior, looking for MORENO.

54.    On October 10, 2022, CHAMBERS was charged in Douglas County, Kansas District Court with Aggravated Robbery; 21-5420(b)(1) and Kidnapping; 21-5408(a)(2), for his role in the April 2, 2022 T-Mobile robbery. CHAMBERS was later released on pre-trial supervision. Through the judicial discovery process in the Douglas County, Kansas criminal case, CHAMBERS received the reports and evidence the prosecution obtained from the

19

investigative agencies. Based on your Affiant's training and experience, it is not uncommon that defendants/co-defendants conspire with one another to avoid prosecution and/or conviction in their criminal case(s). As David Moreno (Iveth MORENO's father) informed FBI personnel that CHAMBERS had reached out for Iveth MORENO, your Affiant believes CHAMBERS and MORENO may have communicated with one another via their cellular devices or social media apps on their cellular devices.

55.    At the date and time of this search warrant application, investigators have not recovered any of the stolen electronic devices (to include cellular telephones) taken during the April 2, 2022 T-Mobile robbery. Based on your Affiant's training and experience in working crimes associated to robberies of commercial businesses and stolen items, your Affiant believes the **Target Telephone** (seized from CHAMBERS' person on February 9, 2023) could provide law enforcement with additional evidence related to the crimes. Based on your Affiant's training and experience, it is common for subjects who commit robberies and possess stolen items to utilize their cellular devices in furtherance of their crimes. It is your Affiant's belief that CHAMBERS' **Target Telephone** could store evidence, to include: the location of the stolen electronic items from the T-Mobile store robbery, and or any other cellular telephone(s)/electronic device(s) that can be contributed to other robbery investigations involving CHAMBERS. Your Affiant believes a search of CHAMBERS' **Target Telephone** could also provide investigators the ability to verify its telephone number and the International Mobile Equipment Identity (IMEI) (to verify the cellular telephone is or is not reported as stolen). Additionally, a search of CHAMBERS' **Target Telephone** will likely reveal additional communications between MORENO and CHAMBERS about the T-Mobile robbery. Based on your Affiant's training and experience investigating robbery related crimes, I know that two or more subjects involved in a robbery will often communicate using a cellular telephone to pre-

20

plan and/or strategize methods prior to committing a robbery, along with communicating about the robbery after the fact. Additionally, your Affiant knows the communications between cellular telephones can include Multimedia Messages (MMS), Short Message Service (SMS) messages, both commonly referred to as text messaging, along with telephone calls, social media messages, photographs and/or videos, contact(s) information, and location information.

56.    Affiant believes probable cause exists to request the authorization of a search and full extraction of an **Apple iPhone, Model: Pro, Color: Midnight-Space Gray, Labeled FBI Evidence Number: E6605949 (Target Telephone),** belonging to Darien Chambers, will lead to evidence, fruits and/or instrumentalities of violations of Title 18, United States Code, Sections 1951(a) and 2 (Interference with Commerce by Robbery) and Title 18, United States Code, Section 924(c)(1)(A)(ii) and 2 (Use of a Firearm in Furtherance of a Crime of Violence) more fully described in Attachment A, and seizure of the property fully described in Attachment B.

## TECHNICIAL TERMS

57.    Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text

21

messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global

22

Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP

addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

58.  Based on my training and experience, I know that the **Target Telephone** has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, PDA, and to access the internet.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

59.  Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

60.  There is probable cause to believe that things that were once stored on the **Target Telephone** may still be stored there, for at least the following reasons:

a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be

24

stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

61.  *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Target Telephone** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Target Telephone** because:

25

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a electronic device is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

26

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

62. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant. After the initial imaging, the examiner and agents will not further save or copy data unrelated to the violations set forth in the application and affidavit. To the extent possible, they will minimize the review of unrelated data.

a. The data extraction process will be performed by the Heart-America Regional Computer Laboratory, which has highly trained personnel in extracting information from cellular telephones as it relates to criminal investigations.

63. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

64. Based upon the foregoing, my training and experience, and through the evidence gathered in the course of this investigation, I believe there is probable cause for a search warrant authorizing the examination of the **Target Telephone** to see the items described in Attachment A, incorporated by reference herein, which is property that constitutes evidence

27

and/or fruits and instrumentalities of criminal offenses, including: Title 18, United States Code, Sections 1951(a) and 2 (Interference with Commerce by Robbery) and Title 18, United States Code, Section 924(c)(1)(A)(ii) and 2 (Use of a Firearm in Furtherance of a Crime of Violence).

FURTHER YOUR AFFIANT SAYETH NAUGHT

Respectfully submitted,

Ryan M. Padilla
Task Force Officer
Federal Bureau of Investigation

Sworn to and attested by affiant via telephone after being submitted to me by reliable electronic means on March 24, 2023.

HONORABLE TERESA J. JAMES
United States Magistrate Judge

28

## ATTACHMENT A
## Property to be searched

1.) An Apple iPhone, Model: Pro, Color: Midnight-Space Gray, Labeled FBI Evidence

Number: E6605949 (Target Telephone).

- Described as belonging to Darien Chambers.
- The Target Telephone is currently being stored at the FBI Topeka Resident Agency (TRA) located at 515 S. Kansas Avenue, Topeka, Kansas 66603.

## ATTACHMENT B
### Items to be Seized

The scope of evidence to be seized by federal law enforcement authorities is limited to those offenses under Title 18, United States Code, Sections 1951(a) and 2 (Interference with Commerce by Robbery); and Title 18, United States Code, Sections 924(c)(1)(A)(ii) and 2 (Use of a Firearm in Furtherance of a Crime of Violence). Accordingly, law enforcement authorities are approved to seize the following items:

1. Any and all documents, photographs, videos, stored information, or other materials that relate to business robberies, to include cellular telephone(s) and or electronic device(s) robberies.

2. Any and all Multimedia Messages (MMS), Short Message Service (SMS) messages, both commonly referred to as text messaging, along with telephone calls.

3. Lists of customers and related identifying information; Related to the sale(s) of cellular telephones and or electronic devices.

4. Types, amounts, prices, as well as dates, places, and amounts of specific transactions; Related to the cellular telephones and or electronic devices.

5. Any information related to sources of cellular telephones and or electronic devices (including names, addresses, phone numbers, or any other identifying information);

6. Any information recording CHAMBERS' schedule or travel;

7. Any and all information related to CHAMBERS' bank records, checks, credit card bills, account information, and other financial records.

8. Any and all computer-related documentation, computer passwords and data security devices;

30

9. Any and all storage media, including any physical object upon which computer data can be recorded, such as Subscriber Identity Module (SIM) card, hard disks, RAM, floppy disks, flash memory, CD-ROM's and other magnetic or optical media;

10. Any and all computer software, including programs to run operating systems, applications (such as word processing, graphics or spreadsheet programs), utilities, compilers, interpreters, and communication programs including, but not limited to Skype;

11. Any and all records, information, documents, invoices and materials, in any format or medium (including, but not limited to, email messages, text messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, such as software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage; and any internet search history.

12. Evidence of user attribution showing who used or owned the Target Telephone at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

31